CHICAGO, B. & Q. R. CO. v. RUAN TRANSP. CORPORATION.

CHICAGO, B. & Q. R. CO. v. HAWLEY.

Nos. 13717, 13718.

United States Court of Appeals
Eighth Circuit.

Dec. 23, 1948.

Rehearing Denied Feb. 7, 1949.

John Hale and J. C. Pryor, both of Burlington, Iowa, for appellant.

D. J. Fairgrave, of Des Moines, Iowa (Howard A. Steele, of Des Moines, Iowa, on the brief), for appellees.

Before SANBORN, WOODROUGH and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

These appeals are from judgments rendered on jury verdicts in actions brought by appellees, Ruan Transport Corporation and William D. Hawley, against the appellant, Chicago, Burlington & Quincy Railroad Company, to recover damages sustained by appellees as the result of a collision between one of appellant's passenger trains and a gasoline transport truck owned by appellee, Ruan Transport Corporation, and driven at the time of the collision by its employee, William D. Hawley. The transport truck was in two units, a tractor and a trailer tank loaded with 6,300 gallons of gasoline. The tractor had eight drive wheels on tandem axles at the rear, each axle having a double wheel at either end. The combined length of the tractor and tank was 45 feet, and when the tank was fully laden, as it was at the time of the accident, the total weight of the transport and load was about 60,000 pounds. The tractor was destroyed in the collision. The trailer tank was not injured. Hawley received serious and permanent injuries.

These appeals present the single question, whether under the law of Iowa Hawley, the driver of the truck transport, was guilty of contributory negligence barring recovery on behalf of either of the appellees.

The accident occurred about 2:40 p. m. on a clear day at the 28th Street crossing in the town of Bettendorf, Iowa. There are five railroad tracks at the 28th Street crossing, which for convenience may be referred to as tracks 1, 2, 3, 4, and 5. Track 2 is the main line on which the collision occurred. The others are sidetracks or passing tracks. All of the tracks are the property of the Davenport, Rock Island and Northwestern Railroad, and by arrangement with that company track 2 is used by the appellant railroad company and by other companies for the operation of trains. The Davenport, Rock Island and Northwestern Railroad has exclusive charge and control of all car movement and car placement on the sidetracks.

Twenty-eighth, the last street in Bettendorf, runs approximately north and south, and the railroad tracks east and west. The street crosses the tracks about 1 mile east of the Bettendorf station. The roadway is gravel and dirt and rough. The crossing is level. East of the intersection track 2 is straight for approximately 1 mile.

The passenger train which collided with the transport truck was westbound, and the truck at the time of the accident was being driven from the south to the north. It reached track 5 first and crossed that track and tracks 4 and 3 before reaching track 2 on which the collision occurred. It is undisputed that as Hawley approached the railroad tracks from the south the view to the east of the crossing was completely obstructed by freight cars on tracks 3 and 4. On track 5 about 150 feet east of the crossing there was a switch engine and a string of cars of the Davenport Railroad waiting for the Burlington train to pass on track 2.

The car nearest the crossing on track 3 stood approximately 75 or 80 feet east of 28th Street. Just prior to the accident Hawley had loaded the trailer tank at the Standard Oil bulk plant which is located east of 28th Street and on the south side of the railroad tracks. Leaving the Standard Oil plant Hawley drove a short distance to the west parallel to the railroad tracks until he approached 28th Street, where he was to make a sharp turn to the north to cross the tracks. As he approached this turn, he saw another truck coming from the north across the railroad tracks. He stopped until that truck had made the crossing and rounded the turn, since the width of the roadway at the turn was not sufficient to permit the trucks to pass. Thereafter,

Hawley made the turn into 28th Street and drove his truck to the north until he reached a point about 8 feet south of the south rail of track 5 where he stopped. He testified that at this point he looked and listened, that he was unable to see to the east because of the cars on tracks 4 and 3, and that he did not hear an approaching train.

While his transport was stopped at the point mentioned Hawley unfolded his leather coat which he had in the cab of the tractor, removed from a pocket of the coat a supply of Copenhagen snuff, and, as he said, "took out a chew," and replaced the coat. His testimony was that while this proceeding was in progress he was looking and listening for trains. After the operation just described he placed his truck in "creeper" gear, the lowest driving gear with which his tractor was equipped, and proceeded without stopping at a rate of 2 miles an hour until the front wheels of his tractor were over the north rail and the forward set of drive wheels on the tractor were approximately on the south rail of track 2. The distance traveled from the point where he stopped on approaching track 5 to the point reached when the tractor was struck by the train was approximately 50 feet. The windows in the tractor cab were open. The noise of the moving transport in "creeper" gear was no greater than when running in high gear at 45 miles an hour.

Hawley said that his seat in the cab of his tractor was about 7½ or 8 feet from the front bumper. The distance between the north rail of track 3 and the south rail of track 2 was about 9 feet, 9 inches. Although Hawley testified that he continually looked to the east and listened for a train approaching from the east from the time he started his tractor across track 5, he neither saw nor heard a train until the front bumper of his tractor was over the north rail of track 2. When his tractor had reached this position, he heard the whistle of the train and saw it for the first time at a point on the track between 200 and 250 feet from him, approaching at a speed which he estimated at 50 miles an hour. He stopped his tractor immediately, reversed gears, and while his unit was backing up it was struck by the train.

Hawley was thoroughly familiar with this crossing, having driven his truck across it many times and having crossed it once on the day of the accident. He knew of the presence of the cars on the sidetracks which obscured his view of trains approaching on track 2. He knew that he could not see a train coming from the east for a distance of more than 75 feet from the crossing until the front bumper of his tractor was within 1 or 2 feet of track 2. He knew that the cars on track 3 which prevented him from seeing the train also made it impossible for the enginemen on the train to see him until the front end of his truck had cleared the north rail of track 3. He knew that a number of regularly scheduled passenger and freight trains passed over the crossing on track 2. He knew that the train which struck him was due at the crossing as he approached it. On direct examination he testified that he was looking east because he knew the train that struck him was due along there. On cross examination he modified this statement by saying that he knew when this particular train was due, that he was always on the lookout for it, and that to his knowledge it had not passed the crossing at the time he approached track 2.

The appellees' evidence was that the 28th Street crossing was used by the tank transports serving three oil company plants south of the railroad tracks and east of 28th Street. It was also crossed regularly by employees of these and other industrial plants in that vicinity in their private cars. An employee of the Ruan Transport Corporation testified that trucks operated by that company probably crossed the tracks on 28th Street 75 times a day. There was some evidence that the whistle was not sounded until the train was within 200 or 250 feet of the crossing. Of those who testified for appellees, Hawley was the only one who had any reason to be listening for the whistle. The witnesses who testified for the appellees concerning the sounding of the whistle or ringing of the bell on the engine merely said that they did not hear a whistle or bell until the engine was within 200 or 250 feet of the crossing. Witnesses for the appellant, not connected with either party to the litigation, heard the whis-

tle when the train was 600 or 700 feet from the crossing. One witness for appellant, the fireman on the switch engine of the Davenport Railroad waiting on track 5 for the arrival of the train which struck the truck, and who had some reason to listen for the sound of the approaching train, testified that the whistle was first sounded when the train was ½ mile east of the crossing and again at the whistling post 500 feet east of the crossing and continuously thereafter.

Crites, who was the driver of the truck which passed over the crossing just before the accident, saw the train about ½ mile distant when he came over the crossing. He did not say whether he had heard the whistle as he came over the crossing. He said that, when he saw Hawley start his truck after stopping south of track 5, he knew that the train was approaching and that Hawley was in danger of being struck. He stopped the truck he was driving and watched Hawley drive on the track in front of the train. He saw smoke or steam coming from the smokestack of the engine and heard the whistle when the engine was 200 to 250 feet from the crossing.

The engineer and fireman and conductor of the train testified that the required crossing signals were given as the train approached 28th Street, that the bell was ringing continuously, and that the view of the engineer and fireman was obstructed by the same cars which cut off the view of Hawley. The enginemen saw Hawley's truck come out from behind the cars on track 3 when the train was 150 or 200 feet away from the crossing. The engineer immediately applied the brakes in emergency and sounded the whistle, but was unable to stop before the collision occurred. He testified that the train was stopped as soon as a stop could have been made under the circumstances. All of the train crew estimated the speed of the train at about 40 miles an hour. A witness for appellees estimated the speed of the train at 50 miles an hour at least.

There is no law of Iowa regulating the speed of trains at the point of the accident. There was no evidence that the speed of the train was greater than its usual speed in the vicinity of the crossing.

The court submitted to the jury the question, whether the railroad company was negligent in operating the train at an unreasonable and excessive speed and in failing to give the proper signals of the approaching train by whistle or bell, in view of the fact that the view at the crossing was obscured by cars on tracks 3 and 4, and that the railroad company knew or should have known that the crossing was a particularly dangerous one because of the heavy traffic moving across it. See Mast v. Illinois Central R. Co., D.C.N.D.Iowa, 79 F.Supp. 149, 158. Appellant's motions for a directed verdict made at the close of appellees' evidence and again at the close of all the evidence and for judgment notwithstanding the verdict, all on the ground that Hawley was guilty of contributory negligence, were denied.

Under Iowa law the burden was upon the appellee in each case to establish that Hawley was not guilty of negligence directly contributing in any manner or in any degree to the collision. "Contributory negligence is not a defense. Its absence is a matter to be pleaded and proven to justify recovery." Nurnburg v. Joyce, 232 Iowa 1244, 7 N.W.2d 786, 791; Mast v. Illinois Central R. Co., supra, D.C., 79 F.Supp. 149, at p. 150. In Scherer v. Scandrett, 235 Iowa 229, 16 N.W.2d 329, 331, the trial court sustained the defendant's contentions: (1) that the evidence established that the plaintiff was guilty of contributory negligence; and (2) that, in the event the case was submitted to the jury and a verdict returned for the plaintiff, it would be the duty of the trial court to set the verdict aside for insufficiency of evidence. On appeal the court said: "It is not necessary to pass on the merits of the first of these grounds, for the burden was not upon defendants to establish that plaintiff was guilty of contributory negligence. We are concerned only with the sufficiency of the evidence of plaintiff's freedom from contributory negligence."

The Iowa cases dealing with the question under discussion are legion. Nothing is to be gained by an attempt to reconcile all of them on the facts. See the majority and dissenting opinions in Coonley v. Lowden, 234 Iowa 731, 12 N.W.2d 870, and in Scher-

er v. Scandrett, supra. But there is no conflict in the Iowa cases upon the general rule of law governing the relative rights of railroad and motorist at railroad crossings. "The difficulty in cases of this kind is not so much in stating the principles involved as in applying them to the facts testified to by the witnesses." Scherer v. Scandrett, supra, 16 N.W.2d at page 332.

■ The Iowa cases are uniform in holding that a person approaching a railroad track, a known place of danger, where trains may be expected to pass at any time, is bound in the exercise of common prudence to look and listen before going upon the track. "The duty is placed on the driver of an automobile to look and listen for trains, and it was one of plaintiff's duties to look at the place where, by looking, she could have seen, and by listening, she could have heard * * *." Darden v. Chicago Northwestern R. Co., 213 Iowa 583, 239 N. W. 531, 533. "We have iterated and re-iterated the doctrine that a railway track is always a place of danger, and that it is the duty of one about to cross it, even in the absence of any special warnings or signals on the part of those in charge of the train, to use his senses in order to avoid injury", Hinken v. Iowa Cent. Ry. Co., 97 Iowa 603, 66 N:W. 882, 883. A motorist approaching a railroad crossing will not be heard to say that he looked and did not see what he must have seen had he looked. Kinney v. Larsen, Iowa, 31 N.W.2d 635, 637; Cashman v. Chicago B. & Q. R. Co., 217 Iowa 469, 250 N.W. 111, 112.

■ Kinney v. Larsen, supra, decided April 16, 1948, the latest decision of the Iowa Supreme Court on the question here, is authority for the statement that as a general rule the Iowa court has held that, where the motorist's view of the crossing was so obstructed as to render it impossible or difficult to learn of the approach of the train or where there were present "diverting circumstances" which would tend to throw a motorist off his guard, the question of contributory negligence of the motorist is ordinarily for the jury. 31 N.W.2d 635, at page 638; see also Mast v. Illinois Cent. R. Co., supra, D.C.N.D.Iowa, 1948, 79 F. Supp. 149, at page 175.

It is clear, however, from all Iowa cases that the application of the general rule depends upon the particular facts of each case. In Scherer v. Scandrett, 16 N.W.2d at page 333, it was said that numerous Iowa cases "support the rule that in absence of diverting circumstances or deceptive appearances, a motorist approaching a crossing who knows his view is obstructed until he is close to the track must, in the exercise of due care, not only look when he reaches the point where looking is possible, but must then have his own vehicle under such reasonable control as to enable him to stop if necessary to avoid collision. See: Hitchcock v. Iowa Southern Utilities Co., [233] Iowa [301], 6 N.W.2d 29; Nurnburg v. Joyce, 232 Iowa 1244, 7 N.W.2d 786; Carlin v. Thomson, [234] Iowa [469], 12 N.W. 2d 224; Dean v. Chicago, B. & Q. R. Co., 211 Iowa 1347, 229 N.W. 223."

In Coonley v. Lowden, supra, reversal was asked because of the refusal of the trial court to give the following instruction: "If the view is obstructed to his knowledge to such extent that ordinary care requires that his vehicle be stopped before going upon the track, then a failure to stop such vehicle constitutes contributory negligence."

In holding the refusal to give the instruction not erroneous, the court said: "In view of the instructions given, the ruling was not error. The jury was told among other things that plaintiff was required to take such steps for his own safety as would any person of ordinary prudence under like circumstances; such a person must realize he is approaching a danger zone and bring his car under corresponding control; if there is danger of collision it is for the motorist to stop and wait until the train has passed in safety; ordinary care is commensurate with the danger involved, if the danger is great, the care to be exercised must be great; reasonable care in approaching a railroad crossing is a high degree of care; a person is not permitted to gamble with fate or assume on general principles that he can cross with safety. These instructions were sufficient." 12 N.W.2d at page 877.

From the great number of Iowa cases cited by counsel for the respective parties,

each places particular reliance on one case as conclusive upon the question of the contributory negligence of Hawley. Appellant relies on Dean v. Chicago, B. & Q. R. Co., 1930, 211 Iowa 1347, 1349, 229 N.W. 223; and appellees on Bush v. Chicago, R. I. & P. R. Co., 1933, 216 Iowa 788, 247 N.W. 645. In both cases the injured man was driving his car across a grade crossing where his view of the approaching train was obstructed.

In the Dean case the facts were that Dean approached the crossing from the south at a speed of from 8 to 10 miles an hour until within 4 feet of the railroad track when he reduced his speed to 3 or 4 miles an hour, continuing over the track without stopping. Dean was sitting approximately 7 feet from the front end of his car. His view of the track in the direction from which the train was coming was completely obscured until he was within 3 or 4 feet of the south rail of the track. Like Hawley in the present case, Dean was thoroughly familiar with all the conditions existing at the crossing, having used it for a considerable time prior to the accident. He could have stopped his car within 3 or 4 feet. He did not stop and did not hear the train which struck him. As in the present case, there was evidence that the whistle on the engine was not sounded nor the bell rung as the train approached the crossing. In the course of the opinion (229 N. W. at page 225), the court described the situation at the crossing, and Dean's conduct at the time of the accident, as follows: "This private crossing was exceptionally dangerous because trains approaching it from the west came through a deep cut, which did obscure from view the engine in question, and did deaden somewhat the noise of its approach. The presence of weeds and brush obscured a train from the view of a traveler from the south, and no traveler in an automobile coming from the south to the tracks could see a train approaching from the west until the driver had propelled his automobile almost onto the tracks themselves, and could then see but 40 to 60 feet to the west of him. The road approaching the track was rough and rutty, and steep enough that it required the plaintiff to shift from high gear to inter-mediate, so his car could be propelled to and over the tracks. Plaintiff, with absolute knowledge of all these facts, knew that, if he looked to the west, he could not see an approaching train. * * * The fact is, however, he did not stop, and the fact stands that, had he looked to the west all of the time while approaching the tracks, he could not have seen anything until his car was on, or nearly on, the tracks. Plaintiff must have known, under the circumstances, that, if he did not stop and a train was approaching, which he could not see and could not hear, a collision would be inevitable."

In holding Dean guilty of contributory negligence barring recovery in an action against the railroad company, the court stated the Iowa rule as follows, 229 N.W. at page 225: "It must be conceded that at an obstructed crossing it is the duty of the traveler to exercise a greater degree of care and caution than is incumbent upon him usually, and that there may be such circumstances in a given case that common prudence requires the traveler to stop. It is elementary that, the greater the danger, the greater the care and caution necessary for him to exercise to constitute ordinary or reasonable care. Even the failure of the engineer to ring the bell or sound the whistle, if such be the fact, does not relieve the traveler, about to cross a railroad track, from the necessity of taking ordinary precaution under the circumstances which confront him. The traveler may have the right, as a general rule, to rely on the fact that a railroad company will perform its duty, either at common law, or under the statute, in the operation of its train, but this fact per se does not dispense with the care to be exercised by the traveler, and he may be guilty of contributory negligence under the facts of the particular case to the contrary notwithstanding. Each case must be determined upon its own particular facts. The instant plaintiff knew he was in a zone of danger. He was acquainted with all of the facts of his environment when he approached the tracks of the defendant railroad company."

The Dean case has never been expressly overruled by any later decision of the Iowa Supreme Court. In the opinion four earlier

Iowa cases are cited as authority for the court's decision, and the case has been cited with approval or distinguished in later cases of the Iowa Supreme Court. (Nurnburg v. Joyce, supra; Hitchcock v. Iowa Southern Utilities Co., supra; Scherer v. Scandrett, supra; and in the dissenting opinion in Coonley v. Lowden, supra, in which it is stated that the Iowa cases clearly support the rule as stated in Corpus Juris [52 C.J. 309, citing 5 Iowa cases] that, where the view or hearing of a traveler approaching a railroad crossing is so obstructed that he cannot otherwise satisfy himself whether it is prudent to cross, it is his duty, where he is familiar with the crossing and aware of such facts, to stop and look and listen before going upon the tracks.)

In the Bush case plaintiff was the driver of a truck hauling brick from a freight car on a sidetrack near the crossing at which his truck was struck by a passenger train. There was evidence that the train was proceeding at an excessive rate of speed and that the proper warning signals were not given as it approached the crossing. There was a string of 6 or 8 box cars sitting on the sidetrack west of the crossing and 100 to 125 feet distant from the crossing.

The evidence showed that when Bush reached the crossing where the accident occurred he stopped his truck and looked to the west. The point at which he stopped was about 12 feet from the main line track where the collision occurred. Bush testified that the box cars on the sidetrack cut off his view to the west, that it was necessary because of the rough crossing and because he was driving a heavily laden truck across the sidetrack to concentrate all his attention upon driving the truck. The court held the question of Bush's contributory negligence for the jury saying: "Certainly this court cannot say that a man is negligent as a matter of law if he stops, looks, and listens when only 12 feet from the tracks, and his view is obstructed at that point. We base our conclusion upon the fact that reasonable men would disagree as to the question of appellee's right to recover." 247 N.W. at page 647.

The Bush and Dean cases are distinguishable on the facts in that Bush stopped, looked, and listened 12 feet from the crossing, while Dean did not stop before going on the railroad tracks.

When the evidence in this case is read in the light most favorable to appellees, giving them the benefit of every inference which the jury might reasonably have drawn from the testimony of all the witnesses, the conclusion is inescapable that Hawley was guilty of contributory negligence as a matter of law if the rule announced in the Dean case is still the law in Iowa. But, conceding, as appellees contend, that the Dean case has been modified by later Iowa decisions, the fact which distinguishes this case from all other Iowa cases which counsel has brought to our attention or which our research has found is that Hawley knew that the train which struck his transport was due at the time he approached track 2. He was driving a heavily laden transport, its tank filled with 6,300 gallons of highly inflammable and explosive gasoline. The transport was 45 feet long. Its total weight was 60,000 pounds. It was moving at a speed of 2 miles an hour, slightly under 3 feet per second. Hawley not only knew that the train was due at the crossing at most any moment, but he also knew what kind of a train it was, and from past familiarity with it he had some idea of the speed with which it approached the crossing. He knew that it was late. He knew that as he crossed track 3 he could not see more than 75 feet to the east until the bumper on the front of his transport was very near track 2. He knew that the enginemen on a train approaching at 40 to 50 miles an hour could not discover his approach to the crossing until the front end of his truck had passed the freight cars on track 3, and that, if at that time the train was several hundred feet distant from the crossing where he could not see it, a collision was inevitable if he proceeded over the crossing without stopping.

Hawley must have known the terrible consequences likely to result to him and the trainmen and possibly the passengers on the train from a collision between the train and a tank full of gasoline. And the fact is that Hawley did not look when he could have looked, just before driving his tractor

on the track where the collision occurred. His testimony is that he neither saw nor heard the train until his tractor was across both rails of track 2. But the distance between tracks 3 and 2 was 9 feet, 9 inches, and even allowing for the overhang of the cars on track 3, Hawley, if he had been looking, must have seen the train before he did; and, if he had stopped at a point even where his view to the east was only 75 feet, the collision would not have occurred.

But we need not debate the question of the present status of the Dean case, for under an Iowa statute not involved in any other case as yet decided by the Iowa Supreme Court and never construed by that court, Hawley was required to stop before going over the crossing at a point where by looking and listening he could know that it was safe to proceed. Section 321.343, Code of Iowa, 1946, provides: "The driver of any motor vehicle carrying passengers for hire, or of any school bus carrying any school child, or of any vehicle carrying explosive substances or flammable liquids as a cargo or part of a cargo, before crossing at grade any track or tracks of a railroad, shall stop such vehicle within fifty feet but not less than ten feet from the nearest rail of such railroad and while so stopped shall listen and look in both directions along such track for any approaching train, and for signals indicating the approach of a train * * * and shall not proceed until he can do so safely."

The purpose of this statute is self-evident. It is the legislature's command that the driver of one of the vehicles described shall exercise a degree of care above and beyond that required of the driver of other vehicles at railroad crossings. In the light of the Iowa cases concerning relative rights of motorist and railroad at railroad crossings, this statute must be read to mean that the driver of one of the vehicles described shall stop within the distances specified where by looking he can see and by listening he can hear. The command is that the driver shall not proceed until he knows that to proceed is safe. Nothing less than the undivided attention of the driver to looking and listening is compliance with the statute. If it could be said that Hawley made a literal compliance

with the requirement of the statute as to stopping before crossing, his own testimony shows that while he stopped he did not give his undivided attention to looking and listening for trains. He had no right to assume what he could not know. We think the evidence shows beyond question that if Hawley had stopped and looked and listened at a point on track 3 where he had a view to the east of 75 feet and where he could have heard the train, the collision would not have occurred. With all respect for the decision of the learned trial judge (Russell v. Turner, 8 Cir., 148 F.2d 562, 564), we are unable to escape the conclusion that it was error to refuse the appellant's motion for a directed verdict.

The judgments appealed from are reversed, and the cases are remanded to the district court with directions to dismiss the complaints.