FRANK H. GILLIAM, Appellee, v. CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY, Appellant.

NOVEMBER 20, 1928.

1292

*Aymer D. Davis, J. G. Gamble, R. L. Read,* and *A. B. How-land,* for appellant.

*Peisen & Soper,* for appellee.

WAGNER, J.—The appellant assigns as error the overruling by the court of its motion for directed verdict, which was made at the close of the plaintiff's evidence and renewed at the close of all the evidence. It is the appellant's contention that, under the record, the plaintiff was guilty of contributory negligence, as a matter of law, or that the evidence fails to establish his freedom from contributory negligence. For the determination of this question, we turn to the record, and it is incumbent upon us to give to the testimony of the appellee the most favorable construction that can fairly be placed upon it. The collision occurred at the intersection of appellant's line of railway with one of the streets in Iowa Falls, on September 30, 1925, between 2 and 3 o'clock in the afternoon. At the time in question, the appellee was riding in a left-hand-drive Star touring car, which was operated by one Thomas. The appellee occupied the front seat, to the right of the driver. The appellee met Thomas at a pool hall, and from there they walked to the creamery. The appellee had left his car on the east side of the city; and at the creamery, he told Thomas he was going to walk over to his car, and Thomas responded that he was going over on the east side, and appellee could ride with him. From the creamery, they pursued a course which took them eastward, past the depot district. The appellee testified that, in traveling eastward on the main road, they crossed the Rock Island track; and then turned north, going north about two blocks, and then turned west, stopping in front of the home of Thomas, which is about 175 to 200 feet east of the place of the collision; that, in going north, they passed over two railroad tracks. The appellee had lived in the vicinity of Iowa Falls about 9 years, but had never been on this street running east and west across the railroad track and past the Thomas home. At the place of the collision, the railroad track and the street, which is a dirt street, cross at approximately right angles,

the railroad running approximately straight north from the place of the intersection with the street, for a distance of 550 feet, at which point it begins to curve. The train which struck the car came from the north. For a distance of 100 feet, or more, east of the crossing, there was nothing to obstruct the view of anyone going west in the street and looking to the north and northwest, from seeing a train at any point south of the curve. The point of lowest depression between the Thomas home and the railroad track is about 35 feet east of the crossing, where there is a wooden culvert, with railings thereon. From said culvert there is a slight incline upward to the rails of the track. At the crossing are the usual monuments marking the location of a railroad, such as fences, gates, cattle guards, telegraph poles, and a conspicuous sign upon which are painted the words, in large letters, "Rail-Road Crossing." It was a cloudy afternoon, mist was falling, and some of the witnesses, including the plaintiff, speak of fog. At the time in question, the side curtains were on the car, the one to the right of the plaintiff being the usual ordinary side curtain, with isinglass. There was mist on the wind shield and the isinglass.

The plaintiff testified that he did not, at that time, know there was a railroad there; that, before the accident, he had been to the Burlington, Cedar Rapids & Northern station of the Rock Island, on Sherman Street, and had been to the Short Line station of the Rock Island, on the main road; that he had ridden on the train to Dows, northwest of Iowa Falls; that he knew there was a track running through the Short Line depot,— through the interlocking switch, north toward Hampton,—but he did not know that the track was within a block west of the Thomas home. From the Thomas home, the car was driven west to the crossing, and plaintiff testifies that he did not see the train until just as the car got on the track.

There is testimony as to the failure of the defendant to give the usual alarms, and also there is testimony that the train, at the time, being a heavy freight train, consisting of more than 50 cars, was running from 25 to 30 miles an hour, and other testimony that its rate of speed was not to exceed 10 miles an hour. There is no direct testimony as to the rate of speed of the automobile, but the plaintiff testifies: "Mr. Thomas hadn't shifted the gears into high at the time of the accident." The

plaintiff testifies that he at no time looked to the north or north-west, but that he kept looking ahead, up until the time of the accident; that he kept a front watch out of the wind shield, watching the road; that he did not look through the isinglass at the side of the car after the car started; that he did not look out to the right, to see if a train was coming from the north. He further testified, on direct examination:

"There were side curtains on my right side. It was a kind of drizzly day, dark, cloudy, and foggy-like; there was mist on the curtains and on the wind shield. I should judge a person could see 50 or 75 feet ahead, any moving object, or any signs like that; but it was hard to see them if you didn't understand they were there. There was a fog in there through the low point at the culvert; it was a little thicker there, on account of it being lower than the higher ground. I had never been on that street before. As you leave the Thomas home, the road slopes down into this low place. As we went down the road toward the culvert, the fog got a little thicker. After we got into the traveled track, I watched ahead. The wind shield was—you couldn't see from around 50 feet, or something like that, ahead. Down to the time we came down to the track, there was mist on the isinglass; there was mist on the wind shield. From where I sat, in front of the Thomas house I could not see through the fog and see the track. When we came toward the bridge, I looked ahead. From the time we left in front of the house towards the bridge, I did not see the track."

He further testified on cross-examination:

"The distance that you could see standing objects would depend on how large they were. If it was a car, or something like that, it would be around 50 or 75 feet. I looked out the wind shield. I didn't look out to the right, to see if a train was coming from the north."

The appellant contends that, although the appellee testified that he had never been on the street before, and that it was a strange part of town to him, and he did not know that, in pursuing their journey westward, they had to cross a railroad track, yet, in view of what the witness testified that he could see at a distance of from 50 to 75 feet, the physical facts prove conclu-

sively the falsity of his claim, and the knowledge by him of the fact that he was about to cross a railroad track, and that, after having acquired said knowledge, and not having taken any precaution to ascertain whether a train was coming from the north, he is guilty of contributory negligence. The substance of the defendant's contention is that, since the plaintiff testified that, in his judgment, he could see stationary objects from a distance of from 50 to 75 feet, therefore he had to see, and did in fact see, all the marks indicating the location of the railroad at a distance of from 50 to 75 feet from the crossing. This contention of the defendant's disregards such portions of the appellee's testimony as "But it was hard to see them if you didn't understand they were there;" and also, "The distance you could see standing objects would depend on how large they were," and, "if it was a car, or something like that, it would be around 50 or 75 feet." If the 50 or 75 feet distance was applicable to an object as large as a car, it cannot be said that the witness's testimony is to the effect that smaller objects could be seen at that distance. It is a matter of common knowledge that one can scarcely see through an isinglass and wind shield when covered with mist, as disclosed by the testimony in this case. It is also manifest that the testimony of the plaintiff as to what he could see at the time in question is only his opinion, and does not establish the fact as to what he did, in fact, see.

That one cannot be held guilty of contributory negligence in failing to see through the fog and mist upon the wind shield and isinglass, as revealed by this record, when otherwise it could have been clearly seen, see *Meyer v. Chicago, R. I. & P. R. Co.*, 134 Iowa 722; *Frederickson v. Iowa Cent. R. Co.*, 156 Iowa 26. The question of contributory negligence is ordinarily for the jury. While it was the duty of the plaintiff to show freedom from contributory negligence, it was for the jury to determine said question from all of the facts and circumstances, as disclosed by the evidence.

Among other things, the court instructed the jury that, if they found that the lookout on the train,—if there was a lookout,—saw the car in which plaintiff was riding, as it approached  the crossing in question, and there was danger of a collision, and they further found that, in the exercise of ordinary care, he should have notified the engineer of the danger, but that he failed to

do so until too late to slow up the train or give additional warning by blowing the whistle, or otherwise, and was guilty of negligence in so doing, then defendant would be guilty of negligence; and if they found that, as a proximate result of such negligence, plaintiff, without any fault on his part contributing to the collision, sustained injury, then plaintiff was entitled to recover. The appellant assigns as error the giving of said instruction. Whether this instruction presents a question of original negligence or the doctrine of last clear chance is argued by the respective parties, and we find it unnecessary to determine the classification of said instruction. The evidence does not warrant the giving of the same. The defendant's engineer did not see the automobile. He testified that, before he got to the first semaphore (a half mile or more from the crossing), he blew the whistle, and asked for the blocks; that he answered the block man with two short blasts of the whistle, and after that, whistled for the crossing, two long blasts and two short blasts. Whether the whistle was sounded was for the jury. Peck, a brakeman, testified that, just before the train got to the street crossing, he saw the automobile just inside the right-of-way fence on the highway,—that would be around 40 feet from the east rail of the railroad track. Highbee, a locomotive fireman, testified that, as the train approached the crossing, he saw a car approaching, about four car lengths (160 feet) away from the crossing; that the engine of the train was then in the vicinity of two car lengths (80 feet) from the crossing. He gives, in substance, the same testimony as to the sounding of the whistle as that given by the engineer, and that he watched the car as it approached the track; that the speed of the automobile was not excessive, but that it seemed greater than that of the train, and he spoke to the engineer, telling him to "take hold of her and stop her;'' that the automobile was about 40 or 50 feet from the crossing when he told the engineer to stop the train.

The engineer testifies that, when the train was about 30 or 40 feet from the crossing, the brakeman or the fireman "hollered 'Look out,—stop it;' '' that he pulled the air-brake lever around as far as he could, and there was no chance to stop it any quicker than he did; and that he did not have time to reverse the engine before the engine hit the car. There is no other

testimony in the record as to the matters contained in the fore-going instruction.

It is manifest that, if the instruction was meant to give the doctrine of last fair chance, the requirement that the jury find that the plaintiff was free from contributory negligence is unwarranted, as the doctrine of last fair chance presupposes negligence on the part of the plaintiff. Under the record, after the perilous position of the automobile was in fact discovered by the trainmen, the injury could not have been avoided by the exercise of ordinary care on the part of the men in charge of the train. The employees in charge of the train had the right to assume that the automobile would not be driven heedlessly on the track ahead of the approaching train. It is a matter of common knowledge that automobile drivers frequently drive right up to the track before coming to a stop. Under the record in this case, it is manifest that the employees of the defendant, after they ascertained that the automobile was not going to stop for the crossing, had no time to do more than they did in the preventing of the collision. Therefore, the giving of the aforesaid instruction was erroneous. See *Stanoshek v. Chicago, R. I. & P. R. Co.*, 198 Iowa 62; *Landis v. Inter-Urban R. Co.*, 166 Iowa 20; *Powers v. Iowa Cent. R. Co.*, 157 Iowa 347.

The principle as announced in the foregoing instruction can have no possible application where, as under the record in this case, the perilous position of the automobile in which the appellee was riding was discovered by the employees in charge of the train at a time when manifestly nothing could be done to prevent the collision. *Albright v. Chicago, R. I. & P. R. Co.*, 200 Iowa 678.

Because of the error in giving the aforesaid instruction the judgment of the trial court is hereby reversed, and the cause remanded.—*Reversed and remanded.*

STEVENS, C. J., and EVANS, FAVILLE, and KINDIG, JJ., concur.